# EXHIBITS

A–N to Plaintiff's First Amended Complaint

*Bricker v. Weichert Real Estate Affiliates, Inc., et al.* | *No. 3:26-cv-00702-DRL-SJF*

# INDEX OF EXHIBITS

*Bricker v. Weichert Real Estate Affiliates, Inc., et al.* | *No. 3:26-cv-00702-DRL-SJF*


| | |
|---|---|
| **Exhibit A** — Sworn Affidavit of Tricia Welty-Meyer (May 21, 2024) | 3 |
| **Exhibit B** — Letter of Marge Skwiat Gloy (filed May 22, 2024) | 5 |
| **Exhibit C** — Letter of Chris Redlarczyk (filed May 22, 2024) | 8 |
| **Exhibit D** — Unsigned statement of Tricia Welty-Meyer (Dec. 4, 2024) | 10 |
| **Exhibit E** — Photograph of collapsed roof, 107 Freyer Road | 13 |
| **Exhibit F** — Indiana Court of Appeals Memorandum Decision (June 4, 2025) | 15 |
| **Exhibit G** — Indiana Court of Appeals Order granting Motion to Strike (Jan. 17, 2025) | 25 |
| **Exhibit H** — Dunegrass Properties, Inc. — Secretary of State record | 29 |
| **Exhibit I** — Redlarczyk Properties, LLC — Secretary of State record | 31 |
| **Exhibit J** — Dunegrass — Broker Company license (renewed 6/22/2026) | 33 |
| **Exhibit K** — Weichert of North America — Broker Company license | 35 |
| **Exhibit L** — Redlarczyk / Plaintiff text messages (incl. May 31, 2024 "walleye") | 37 |
| **Exhibit M** — Scalise v. Epstein specific-performance complaint + July 29, 2024 agreement | 40 |
| **Exhibit N** — Weichert Franchise Disclosure Document — excerpts | 51 |

EXHIBIT

A

# Sworn Affidavit of Tricia Welty-Meyer

Bricker v. Weichert et al. | N.D. Ind., South Bend Division

Exhibi

DOCUMENT DESCRIPTION

Dated May 21, 2024
Filed in Lakefront Associates, LLC v. John Bricker
Cause No. 46D04-2404-EV-000564
LaPorte Superior Court No. 4

## PURPOSE IN THESE PROCEEDINGS

Establishes the sworn, notarized false statements made by Defendant Welty-Meyer on May 21, 2024 in LaPorte Superior Court No. 4, including the attribution of failed property closings to Plaintiff's 'obtuse nature' and claims of $26,000 in lost commissions — representations subsequently contradicted by Welty-Meyer's own December 2024 statement attributing those failures to the buyer's lender.

USDC IN/ND case 3:26-cv-00702-DRL-SJF document 1-1 filed 05/21/26 page 3 of 27



State of Indiana

EXHIBIT A

County of LaPorte

# AFFIDAVIT

I, Tricia Welty-Meyer, the managing owner of Weichert Realtors, Merrion Group in Michigan City, IN with 22 years of experience do hereby depose and state as follows:

I'm the realtor with my associate, have been trying to sell the property at 3609 E US Hwy 12 and 210 Freyer Road, Michigan City, IN 46360.

My agent and I have worked very hard on selling this property, in Michigan City, IN for almost 6 months.

1. In my 22 years of real estate, I have never been involved with short term renter of my clients who refused to move out of the space, which he hasn't paid rent.
2. Mr. Bricker obtuse nature has caused us a default on two closing dates, February 29th and now again on May 20th. This cost us $26,000 in commissions, and more time and effort, which we will never get back.

I'm devastated, that this man like John Bricker can injury so many people, when he knew about transaction since early February.

I affirm under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Tricia Welty Meyer

Date: 5/21/24

Sworn to and subscribed before me this 21 day of May, 2024.

Notary Stamp

"OFFICIAL SEAL"
CAROLYN J. STILES
NOTARY PUBLIC-INDIANA
LA PORTE COUNTY - INDIANA
Commission No. NP0673033
My Commission Expires 09/15/2031

[signature]

EXHIBIT

**B**

# Letter of Marge Skwiat Gloy

Bricker v. Weichert et al. — N.D. Ind. (South Bend Division)

DOCUMENT DESCRIPTION

Undated. Addressed to the Honorable Greta Sterling Friedman
Filed May 22, 2024
Lakefront Associates, LLC v. John Bricker
Cause No. 46D04-2404-EV-000564

## PURPOSE IN THESE PROCEEDINGS

Establishes the unsworn, undated ex parte exh_letter submitted by Marge Skwiat Gloy on May 22, 2024, introducing the 'hoarder' characterization traceable to a fake press release authored by non-party Rob Epstein. Later stricken from the appellate record by the Indiana Court of Appeals on January 17, 2025 (see Exhibit G).

USDC IN/ND case 3:26-cv-00702-DRL-SJF document 1-1 filed 05/21/26 page 6 of 55

Attachment I

EXHIBIT B

LaPorte County, Indiana



The Honorable Greta. Sterling Friedman, Judge

My name is Marge Skwiat Gloy the listing agent for James M Epstein, the property at 2609 E Dunes Highway/210 Freyer

On May 16th 2023 I listed for sale, said above property. On June 1st 2023, John Bricker rented space in 3 bay number 2 building. and was told it was for sale and may need to give up that space, so his lease had a 60 day out added and he was fine with that, pretty soon he also had half of building number 2 filled, at the time it was unknown what he needed to remove from prior facility as he was to vacate there. Now with letter from that owner we know.

I have spoke to John several times as to what have you sold? and how do you market it..said on line and they always try to bring down the price. Most of the items are very used and being all used resturant items are hard to believe have much value. He repackages and inventories them, all suggests he is a hoader..See prior lessor's letter on his dilemma.

End conclusion, the owner of 3609 E Dunes Highway, had found Mr. Bricker, two warehouses and would help to move, but he refused and said South Bend was too far.

I see his resturant building where he resides in New Buffalo, Michigan is for sale, I ask why he didn't move items there, he said it's full, no room.

Another agent and I have worked with this contract going on 6 months, and have lost $20 thousand plus income.

No one seen this coming and the buyer has canceled the real estate sale, after several inspections and expensive survey costs that fall on Mr Epstein, of who resides in Florida.

Sincerely

Marge Skwiat Gloy

Marge Skwiat Gloy 219 877 4206

Welchert Realtors/Merrion Group

1010 N Karwick Rd

Michigan City In 46360

EXHIBIT

C

# Letter of Chris Redlarczyk

Bricker v. Weichert et al. · N.D. Ind., South Bend Division

DOCUMENT DESCRIPTION

Undated; Addressed to the Honorable Greta Sterling Friedman
Filed May 22, 2024
Lakefront Associates, LLC v. John Bricker
Cause No. 46D04-2404-EV-000564

## PURPOSE IN THESE PROCEEDINGS

Establishes the unsworn, unnotarized ex parte exh_letter submitted by Defendant Redlarczyk on May 22, 2024, containing representations directly contradicted by Redlarczyk's own text messages to Plaintiff during the same period — including a casual message about Canadian fishing sent nine days after this exh_letter was filed.

STATE OF INDIANA
COUNTY OF LAPORTE
LAPORTE SUPERIOR COURT #4

EXHIBIT C

Re: Cause No: 46D04-2404-ev-564

Lakefront Associates, LLC vs. John Bricker

Your Honor,

I am writing to bring to your attention a matter of great concern regarding the unlawful occupation of my property by Mr. John Bricker. I am the rightful owner of Freezing Systems & Services Inc and the rightful owner of Redlarczyk Properties and the entire building which we use for manufacturing custom equipment. Our building is located at 107 Freyer Road, Michigan City, IN 46360, which Mr. Bricker has been leasing 13,000 of it for storage of his used restaurant equipment. He's been a tenant since 2009.

Despite repeated requests and notices since January 2023, Mr. Bricker has failed to vacate the premises deadline on July 1st, 2023. John has not paid any rent since September of 2023, resulting in significant financial losses for me. Freezing Systems had a new customer lined up needing our space for some very high-end battery production equipment and light manufacturing needs within our space. It was a long-term lease amounting to a much needed $10,000 per month versus $1800 per month. I have been very patient and understanding over the years, but this is costing new hire good paying jobs for Michigan City residents and hard financial losses for us putting our company at risk. His refusal and constant issues to comply with vacating the premises and placed an undue burden on our to lock in the new long term lease with the prior offer which is now gone and lost. We have a dire need to clean the front of our property up that John occupy's and replace the roof so we can get equipment indoors and out of the harsh outside elements.

I respectfully support Mr. Epstein claims against Mr. John Bricker, who has no regards state laws, or even the common courtesy to move out by last year July's deadline and failed to pay past due rent, all the electricity and the utilities in the space he is in.

Thank you for your consideration and help with these issues.

Sincerely,

Chris Redlarczyk

219-879-6236 ext.111

CEO of Freezing Systems and Service Inc.

107 Fryer Road

Michigan City, IN 46360

EXHIBIT

D

# Unsigned Statement Bearing Name of Tricia Welty-Meyer

Bricker v. Wachert et al. — N.D. Ind., South Bend Division



DOCUMENT DESCRIPTION

Dated December 4, 2024
Filed by Counsel for Lakefront Associates, LLC
Bricker v. Lakefront Associates, LLC
Indiana Court of Appeals Cause No. 24A-EV-1315

## PURPOSE IN THESE PROCEEDINGS

Establishes the internal contradiction in Welty-Meyer's sworn statements: this December 2024 filing attributes the failed property closings to the buyer's lender's failure to provide documents — directly contradicting her May 21, 2024 affidavit blaming Plaintiff's 'obtuse nature.' Demonstrates reckless disregard for the truth.

To Whom this May Concern,

**AFFIDAVIT**

EXHIBIT D

**STATE OF INDIANA**
**COUNTY OF LAPORTE**

I, **Tricia Welty-Meyer**, being duly sworn, depose and state as follows:

1. **Professional Background:**
   I am the Managing Owner of **Weichert Realtors, Merrion Group** in Michigan City, Indiana, with **22 years of experience in real estate.**

2. **Subject Matter Case No: 46D03-2410-PL-002838**
   This affidavit concerns the property located at **3809 East Dunes Highway/210 Freyer Road, Michigan City, Indiana**, and is intended to document significant facts and communications related to **Mr. Scalise** and his attorney's baseless claim that they were *prepared to close.*

3. **Interaction with Mr. Scalise's Real Estate Agent:**
   - I was informed by the realtor, **Mary Beth Meyers**, the Buyer's Agent, that they would not proceed with the closing if **John Brinker (Tenant)**, remained in the building.
   - We advised them that Mr. Brinker had filed an appeal, which could extend the timeline. This stipulation was made clear during discussions regarding the transaction.

4. **Communication with the Title Company:**
   - I also spoke with **Carolyn Stiles at Fidelity Title**, who stated:
     - "We never had any clear close documents from lender provided either *before or after September 30.*"
   - This statement referred to the lack of all the necessary documents required by the title company to finalize the closing. (The bank provides title with appropriate docs when a buyer is able to close per their banks requirements.)
   - Additionally, a document from Mr. Scalise claimed he would drop or negate the specific requirement that Mr. Brinker's belongings must be removed before closing. Despite this, no such action was ever taken.

5. **Attempts to Contact Attorney:**

- We attempted to contact Attorney Mr. Ambers, Who represents Mr. Scalise, for weeks with no response.
- Due to the lack of communication, I personally delivered the earnest check for $10,000 to facilitate progress. Attorney Ambers secretary received the check. Ambers office still holds the check.

6. **Additional Relevant Facts:**
   - **Delay and Non-Compliance:** Mr. Scalise's actions reflect a consistent pattern of delays, non-compliance, and attempts to renegotiate terms to the detriment of other parties involved.
   - **Breaches of Agreement:**
     - The **first closing documents** were breached due to failure to adhere to contractual obligations.
     - The **second closing document** was similarly breached due to undisclosed changes in financing arrangements.
   - **Misrepresentation:** Misleading conduct and inaccurate information provided by Mr. Scalise's real estate agent and their Attorneys lack of response further complicated the transaction.
7. **Purpose of Affidavit:**
   - This affidavit documents my observations and involvement in the matter, providing a factual basis for resolving the ongoing dispute.

I declare under the penalties of perjury that the foregoing representations are true to the best of my knowledge and belief.

**Dated:** 12/4/2024

**Tricia Welty-Meyer**
Managing Owner
Weichert Realtors, Merrion Group

EXHIBIT

E

# Photograph of Collapsed Roof — 107 Freyer Road

Bricker v. Weichert et al. · N.D. Ind. · South Bend Division



DOCUMENT DESCRIPTION

Michigan City, Indiana
Taken September 12, 2025
Documenting structural failure of building during Plaintiff's tenancy

## PURPOSE IN THESE PROCEEDINGS

Photographic evidence of the catastrophic structural collapse of the barrel-vaulted roof at 107 Freyer Road, Michigan City, Indiana, taken September 12, 2025. Corroborates Plaintiff's account of the documented habitability failures that motivated lawful rent withholding beginning September 2023.

EXHIBIT E



EXHIBIT

F

## Memorandum Decision — Indiana Court of Appeals

Bricker v. Weichert et al. — N.D. Ind. (South Bend Division)

Exhibits

DOCUMENT DESCRIPTION

Dated June 4, 2025
Bricker v. Laketront Associates, LLC
Court of Appeals Cause No. 24A-EV-1515
Non-Precedential Decision Affirming Trial Court

### PURPOSE IN THESE PROCEEDINGS

The Indiana Court of Appeals non-precedential memorandum decision of June 4, 2025, affirming the eviction order under the prima-facie-error standard (no appellee's brief filed). The appellate court expressly declined to address whether the lease's contractual protections were complied with — leaving those issues unresolved and available for adjudication in this proceeding.

EXHIBIT F



MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision is not binding precedent for any court and may be cited only for persuasive value or to establish res judicata, collateral estoppel, or law of the case.

IN THE

# Court of Appeals of Indiana

FILED
Jun 04 2025, 8:44 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

John Bricker,
*Appellant-Defendant,*

v.

James Epstein d/b/a Lakefront Associates, LLC,
*Appellee-Plaintiff.*

June 4, 2025

Court of Appeals Case No.
24A-EV-1815

Appeal from the
LaPorte Superior Court

The Honorable
Greta Stirling Friedman, Judge

Trial Court Cause No.
46D02-2404-EV-564

**Memorandum Decision by Senior Judge Crone**
Judges Bailey and Foley concur.

**Crone, Senior Judge.**

## Statement of the Case

[1] John Bricker (Bricker) appeals the judgment of the small claims court in favor of James Epstein (Epstein) d/b/a Lakefront Associates, LLC (Lakefront) in an action for unpaid rent, eviction, and damages. We affirm and remand for a hearing on damages.

## Facts and Procedural History

[2] Epstein owns property in Michigan City and is the president and sole member of Lakefront. Bricker operates a business that purchases and resells used restaurant equipment.

[3] Bricker signed a commercial lease agreement with Lakefront on June 1, 2023, with the term of the lease "continuing until June 1, 2024 thereafter month to month until terminated or revised pursuant to the rental agreement." Appellant's App. Vol. 2, p. 22. Per the terms of the agreement, Bricker prepaid $3,500.00 for the period of June 1, 2023 until November 1, 2023. Thereafter, the payment was $700.00 per month. The lease agreement contained a notice provision, which provided as follows:

> All notices and demands which may or are to be required or permitted to be given by either party to the other hereunder shall be in writing. All Notices and demands by the Landlord to the Tenant shall be sent by certified United States mail, postage prepaid, notices from the Tenant addressed to the Landlord at the place where rent is payable, or to such other person or place as the Landlord may from time to time designate in a notice to the Tenant.

*Id.* at 26.

[4] The parties entered into two addenda contemporaneously with the execution of the lease agreement. In the first addendum, the parties agreed in pertinent part that,

> this lease is for a period of 12 months beginning June 1, 2023. Lease shall continue on a month to month period with 60 day cancellation agreement for any reason by either party following June 1, 2024. If either party intends to terminate the Lease on June 1, 2024 than [sic] written notice shall be given to the other party by April 1, 2024.

*Id.* at 29. Because Lakefront was trying to sell the property, the first addendum also contained a clawback provision, which provided that,

> For the initial 12 month period, [u]pon the sale of the property or accepted offer with customary deposit by buyer landlord shall have the right to terminate the lease with 60 days written notice. Upon said notice rental [sic] shall cease, on the date of said notice and any prepaid rental [sic] shall be returned to Tenant.

*Id.*

The second addendum provided, in pertinent part,

> Both parties agree to lease two additional sections of Building 1 under the same conditions as the original Lease Agreement dated June 1, 2023. Tenant shall pay an additional $400.00 per month starting with the first monthly rental payment due on the original lease and shall continue monthly while the original lease is active.

*Id.* at 30.

And the lease agreement contained provisions defining events of breach or default. Nonpayment of rent was not defined as an automatic breach, but an event that with notice could be cured within ten days. *Id.* at 25. Thereafter, if there was no cure, nonpayment of rent converted into a default or breach of the lease agreement. *Id.*

After the first five months, Bricker made his November and December 2023, and January and February 2024 payments to Lakefront or Epstein. The parties disagree about the effect of missed payments and efforts made thereafter to cure nonpayment. Nevertheless, Epstein sent text messages to Bricker, the first of which sent on March 9 read, "still no rent check[,]" followed the next day by one which read, "are you not getting my messages[.]" Ex. Vol. 3, p. 24 (Plaintiff's Ex. 4). Bricker responded, "I only got one message[.]" *Id.* Epstein inquired again, "no rent check this month?" *Id.* Epstein testified that Bricker responded that he had already sent the money to him.

[11] The parties presented differing accounts to support their arguments about the subsequent payments. Nevertheless, Bricker admitted at the July 10 hearing that he had not paid rent for July 2024. But he filed an Affirmation of Payment on July 11, 2024, stating that he had paid the rent on July 10 or 11.

[12] As for notice to quit, Epstein emailed Bricker on March 28 that he was memorializing a March 15 conversation notifying him that he must vacate the leased premises. On April 17, the county sheriff delivered to Bricker a copy of a Notice to Quit dated April 10, demanding that Bricker turn over the premises to Lakefront within ten days of receipt unless Bricker cured the nonpayment of rent.

[13] At the hearing in this matter, Bricker introduced a letter addressing the Notice to Quit in which he claimed to have included a cashier's check "to cover whatever claim" Epstein believed he had. Appellant's App. Vol. 2, p. 44. Bricker attached to his response to Lakefront's motion for summary judgment a copy of a cashier's check dated April 16, 2024 in the amount of $2,200 made payable to the order of Lakefront. *Id.* at 61. However, that exhibit was not admitted at the hearing. Epstein testified that although he received the mailing, there was no check inside the envelope.

[14] On April 24, 2024, Lakefront's attorney sent a letter by certified mail to Bricker notifying him that the lease was scheduled to terminate on May 31, 2024 and that he should make arrangements to remove his personal property. Also, on April 24, 2024, Lakefront filed a Notice of Claim against Bricker alleging the

USDC IN/ND case 3:26-cv-00702-DRL-SJF document 1-1 filed 05/21/26 page 20 of 27


nonpayment of rent for March and April 2024, and seeking a judgment for $2,200 and an order of possession. Bricker filed an answer and affirmative defenses on May 16, 2024, contending that all rent had been paid and that he was not given notice of such nonpayment as required by the terms of the lease agreement. He also claimed that he attempted to cure the alleged breach of the lease for nonpayment. On May 31, 2024, Lakefront's attorney sent a letter by certified mail reiterating that the lease was to conclude that day, notifying Bricker to remove his personal property, and that if Bricker was unable to do so, a $10,000.00 monthly fee would be charged for the unauthorized storage of his property on the premises beginning June 1, 2024. Bricker did not move out of the leased premises at that time.

[12] On June 10, 2024, Lakefront filed a motion for summary judgment. Bricker filed a counterclaim against Lakefront asserting damages from Epstein's alleged wrongful eviction and failure to follow the terms of the lease agreement. Next, Bricker filed a motion to dismiss Lakefront's claim based on its failure to provide notice of the alleged nonpayment of rent in the manner required by the lease agreement, Lakefront's failure to allow Bricker to cure any nonpayment, Epstein's use of improper eviction proceedings to circumvent lease provisions in the event he found a buyer, and the failure to state an actionable claim for breach of the lease.

[13] The court held a hearing on July 10, 2024 during which it heard the parties' claims and received evidence. At the hearing, Bricker explained his justification for initially failing to pay rent then partially curing his nonpayment. His belief

was that the clawback provision in the lease agreement meant that when Lakefront received an offer to purchase the leased premises, Lakefront had to return or "pay the claw back money, the money for rent" to Bricker. Tr. Vol. 2, p. 12. His belief was that Lakefront had secured a buyer, that Lakefront could not afford to return all of the rent (purportedly owed him under the clawback provision), therefore his rent payment was forgiven. Bricker admitted he did not pay the March and April rent in a timely manner based on this belief. And although Lakefront's claim sought eviction based on nonpayment of rent, the court also heard evidence on the issues of improper notice and the hold over without objection.

[11] The court's July 22, 2024 order ultimately found in pertinent part that, notwithstanding previous attempts at notifying Bricker, Lakefront no longer wished to extend the lease agreement, there were notices the court found to be adequate to terminate the lease on June 1, 2024, and that nevertheless "the filing of the lawsuit serves as written notice that [Lakefront] wished to end the lease agreement between the parties." Appellant's App. Vol. 2, p. 18. The court then found that Bricker had no legal authority to occupy the leased premises and granted Lakefront's request for an order of possession. To that end, the court ordered Bricker to vacate the premises by July 31, 2024 and set the matter for a damages hearing. This appeal ensued.

## Discussion and Decision

[13] Judgments in small claims actions are "subject to review as prescribed by relevant Indiana rules and statutes." Ind. Small Claims Rule 11(A). We will not set aside the factual findings or judgment entered in a bench trial unless clearly erroneous. Ind. Trial Rule 52(A); *Trinity Homes*, 848 N.E.2d 1065, 1067 (Ind. 2006). In determining whether a judgment is clearly erroneous, we do not reweigh the evidence or determine witness credibility. *City of Dunkirk Water & Sewage Dep't v. Hall*, 657 N.E.2d 115, 116 (Ind. 1995). We consider only the evidence supporting the judgment and the reasonable inferences drawn from that evidence. *Id.* This "deferential standard of review is particularly important in small claims actions, where trials are 'informal, with the sole objective of dispensing speedy justice between the parties according to the rules of substantive law.'" *Id.* (quoting S.C.R. 8(A)). We review questions of law de novo, just as we do in appeals from a court of general jurisdiction. *Trinity Homes*, 848 N.E.2d at 1068.

[14] However, we note that Lakefront has not filed an appellate brief. When an appellee has not filed a brief, "we need not undertake the burden of developing an argument on the appellee's behalf." *Trinity Homes, LLC v. Fang*, 848 N.E.2d at 1068. "[W]e will reverse the trial court's judgment if the appellant's brief presents a case of prima facie error." *Id.* Prima facie error is error "at first sight, on first appearance, or on the face of it." *Id.* (citation omitted). If an appellant is unable to meet this burden, we will affirm. *Id.*

[17] Bricker seeks reversal of the court's judgment, arguing that the court erroneously construed the First Addendum to mean that notice to end the lease agreement by June 1, 2024 did not require notice by certified mail. He further argues that the court erroneously concluded that Lakefront cured the failure to send notice to end the lease agreement on June 1, 2024 by sending notice by certified mail after April 1, 2024. And he contends that the court erred by concluding that the Small Claims Court Rules prohibited the court from considering his motion to dismiss.

[18] We need not address those issues to sustain the court's judgment, however, because the order provided alternative bases for the ruling. The court found, "That even if the previous written notices were not sent and received, the filing of the lawsuit serves as written notice that the Plaintiff wished to end the lease agreement between the parties." Appellant's App. Vol. 2, p. 18. The First Addendum provided that after June 1, 2024, the lease shall continue on a month-to-month basis with a sixty-day cancellation agreement for any reason by either party.

[19] The small claims action was filed on April 24, 2024 and the court's order was issued on July 22, 2024. We agree with the court's conclusion that the filing of the lawsuit served as notice to Bricker that Lakefront was ending the lease agreement because Lakefront could terminate the lease agreement with notice for any reason. More than sixty-days passed between the filing of the complaint and the court's order. Consequently, the court was correct when it found that

Lakefront was entitled to possession of the premises because it gave notice to Bricker by filing suit seeking termination of the lease agreement.

[illegible] The matter is therefore remanded to the trial court for a hearing on damages.

## Conclusion

[illegible] Based on the foregoing, we conclude that Bricker has failed to establish by prima facie evidence that the trial court erred by entering its order of eviction.

[illegible] Affirmed and remanded.

Bailey, J., and Foley, J., concur.

ATTORNEYS FOR APPELLANT

Michael C. Cooley
Corwin S. Marcum
Allen Wellman Harvey Keyes Cooley, LLP
Greenfield, Indiana

EXHIBIT

G

# Order Granting Plaintiff's Motion to Strike

[illegible]

Exhibits

DOCUMENT DESCRIPTION

Dated January 17, 2025
Indiana Court of Appeals
Bricker v. Lakefront Associates, LLC
Cause No. 24A-EV-1315
Striking Attachments I, P, and [illegible] to Appellee's Motion to Dismiss

## PURPOSE IN THESE PROCEEDINGS

The Indiana Court of Appeals January 17, 2025 order granting Plaintiff's Motion to Strike, confirming that the Gloy exh_letter, the Redlarczyk exh_letter, and the Welty-Meyer affidavit were improperly submitted ex parte communications that did not qualify as affidavits under Indiana law. Corroborates the unsworn nature of the defamatory submissions at the core of Plaintiff's claims.

EXHIBIT G



IN THE

# COURT OF APPEALS OF INDIANA

John Bricker,
*Appellant,*

v.

James Epstein D/B/A
Lakefront Associates, LLC,
*Appellee.*

Court of Appeals Cause No.
24A-EV-1815

FILED
Jan 17 2025, 11:25 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## Order

[1] Appellee, by counsel, has filed a Verified Motion to Dismiss Appeal Pursuant to Indiana Rule of Appellate Procedure 36. Appellant, by counsel, has filed a Response in Opposition to Appellee's Verified Motion to Dismiss Appeal Pursuant to Indiana Rule of Appellate Procedure 36. Appellant, by counsel, has also filed a Motion to Strike Attachments I, II, and III to Appellee's Motion to Dismiss Appeal and a Verified Motion for Appellate Attorney Fees.

[2] Having reviewed the matter, the Court finds and orders as follows:

1. Appellee's Verified Motion to Dismiss Appeal Pursuant to Indiana Rule of Appellate Procedure 36 is denied.
2. Appellant's Motion to Strike Attachments I, II, and III to Appellee's Motion to Dismiss Appeal is granted.
3. Appellant's Verified Motion for Appellate Attorney Fees is held in abeyance to be addressed by the writing panel to which this case is assigned.
4. Personnel in the Office of the Administrator are directed to mark the docket to bring this order and Appellant's Verified Motion for Appellate Attorney Fees to the attention of the writing panel to which this case is assigned.

5. The parties are cautioned that the continued submission of repetitive filings that do not comply with the Appellate Rules may result in sanctions. *See* Ind. Appellate Rule 66(E) (allowing Court to assess damages if a motion or response is frivolous or in bad faith).

Ordered: 1/17/2025

Kenworthy, Felix, JJ., Najam, Sr.J., concur.

For the Court,

Chief Judge

# EXHIBIT H

Indiana Secretary of State business record — Dunegrass Properties, Inc. (ID 2014022000562); administratively dissolved August 5, 2024

**BUSINESS INFORMATION**
DIEGO MORALES
INDIANA SECRETARY OF STATE
07/04/2026 10:43 PM

## Business Details

| | | | |
|---|---|---|---|
| Business Name: | **DUNEGRASS PROPERTIES INC.** | Business ID: | **2014022000562** |
| Entity Type: | **Domestic For-Profit Corporation** | Business Status: | **Admin Dissolved** |
| Creation Date: | **02/20/2014** | Inactive Date: | **08/05/2024** |
| Principal Office Address: | **1010 N. Karwick Rd., Michigan City, IN, 46360, USA** | Expiration Date: | **Perpetual** |
| Jurisdiction of Formation: | **Indiana** | Business Entity Report Due Date: | **02/29/2024** |
| | | Years Due: | **2024/2025, 2026/2027** |

## Governing Person Information

| Title | Name | Address |
|---|---|---|
| Vice President | Jeffrey A. Meyer | 435 Boyd Circle, Michigan City, IN, 46360, USA |
| President | Mary P. Welty-Meyer | 435 Boyd Circle, Michigan City, IN, 46360, USA |
| President | Mary P. Welty-Meyer | 435 Boyd Circle, Michigan City, IN, 46360, USA |

## Incorporator Information

| Name | Title | Address |
|---|---|---|
| MARY PATRICIA MEYER | Incorporator | 435 BOYD CIRCLE, MICHIGAN CITY, IN, 46360, USA |

## Registered Agent Information

Type: **Individual**
Name: **MARY P. WELTY-MEYER**
Address: **435 BOYD CIRCLE, MICHIGAN CITY, IN, 46360, USA**

# EXHIBIT I

Indiana Secretary of State business record — Redlarczyk Properties, LLC (ID 2007052200234); Christopher James Redlarczyk sole governing person

**BUSINESS INFORMATION**
DIEGO MORALES
INDIANA SECRETARY OF STATE
07/05/2026 07:04 PM

### Business Details

| | | | |
|---|---|---|---|
| Business Name: | **REDLARCZYK PROPERTIES, LLC** | Business ID: | **2007052200234** |
| Entity Type: | **Domestic Limited Liability Company** | Business Status: | **Active** |
| Creation Date: | **05/21/2007** | Inactive Date: | |
| Principal Office Address: | **107 FREYER ROAD, MICHIGAN CITY, IN, 46360, USA** | Expiration Date: | **Perpetual** |
| Jurisdiction of Formation: | **Indiana** | Business Entity Report Due Date: | 05/31/2027 |
| | | Years Due: | |

### Governing Person Information

| Title | Name | Address |
|---|---|---|
| President | Christopher James Redlarczyk | 107 Freyer Rd, Michigan City, IN, 46360, USA |

### Registered Agent Information

Type: **Individual**

Name: **CHRIS REDLARCZYK**

Address: **107 freyer road, Michigan City, IN, 46360, USA**

# EXHIBIT J

Indiana Real Estate Commission license — Dunegrass Properties, Inc., d/b/a Weichert Realtors – Merrion Group (No. RC51400056), renewed June 22, 2026

# Indiana Professional Licensing Agency

*Real Estate Commission — Facility License Record*

**Dunegrass Properties Inc.**

**Doing Business As:** Weichert Realtors – Merrion Group
**Address:** 1010 N. Karwick Rd., Michigan City, IN 46360 (LaPorte County)
**License Number:** RC51400056
**Profession:** Real Estate Commission
**License Type:** Real Estate Broker Company
**Status:** Active
**Issued:** 3/5/2014
**Expiration:** 6/30/2029
**Renewed:** 6/22/2026
**Method:** Application

**Related Licenses (affiliated licensees):**

Mary P. Welty-Meyer (RB14043015) — Manager
Marge Skwiat-Gloy (RB14037773) — Employer/Employee
Jeffery Meyer (RB14049242) — Employer/Employee
Jane F. Cooley (RB14015563) — Employer/Employee
Diana L. Hirsch (RB14044783) — Employer/Employee
Clifford Lawton (RB14051103) — Employer/Employee
Gail M. Mathews (RB14046438) — Employer/Employee
Vanessa T. Piemonte (RB24000107) — Employer/Employee
Laura Pratt (RB25000656) — Employer/Employee
Lorraine Rasmussen (RB21000912) — Employer/Employee
Deborah E. Vance (RB18000552) — Employer/Employee

*Source: Indiana Professional Licensing Agency license lookup, mylicense.in.gov (reproduced from the state record).*

# EXHIBIT K

Indiana Real Estate Commission license — Weichert of North America, Inc. (No. CO50700072); Kevin A. Hill, designated manager

## Indiana Professional Licensing Agency

*Real Estate Commission — Facility License Record*

**Weichert of North America, Inc.**

**Address:** 10646 Walnut Creek Dr W, Carmel, IN 46032 (Hamilton County)
**License Number:** CO50700072
**Profession:** Real Estate Commission
**License Type:** Real Estate Broker Company
**Status:** Active
**Issued:** 2/5/2007
**Expiration:** 7/15/2026
**Renewed:** 4/18/2023
**Method:** Application

**Related License (designated manager):**

Kevin A. Hill (RB14047116) — Real Estate Broker — Active — Manager

*Source: Indiana Professional Licensing Agency license lookup, mylicense.in.gov (reproduced from the state record).*

# EXHIBIT L

Text-message conversation between Chris Redlarczyk (Freezing Systems & Services) and Plaintiff, April–October 2024, including the May 31, 2024 "walleye" message

## Conversation with Freezing Systems

9/14/2024

SMS - Sent on 9/14/2024 at 1:01 PM.

Unless you here a contractor with a crew

SMS - Sent on 9/14/2024 at 1:01 PM.

I'm not sure, he's done carpentry, his brother is a carpenter but I can only recommend him as a semi-reliable body. But thats all that is out there.

SMS - Received on 9/14/2024 at 12:30 PM from Freezing Systems (+12194052457).

FS

Okay 👍 I'll keep him in mind for demo is he skilled? Like roof repair etc?

9/11/2024

SMS - Received on 9/11/2024 at 4:23 PM from Freezing Systems (+12194052457).

FS

OK, I'll be up there in a few minutes

SMS - Received on 9/11/2024 at 2:36 PM from Freezing Systems (+12194052457).

FS

I couldn't hear you

8/12/2024

SMS - Received on 8/12/2024 at 8:32 AM from Freezing Systems (+12194052457).

FS

Good morning John. How close are you up front almost done?

5/31/2024

SMS - Received on 5/31/2024 at 4:43 PM from Freezing Systems (+12194052457).

FS

Okay 👍 thanks hopefully we slay some walleye

SMS - Received on 5/31/2024 at 4:04 PM from Freezing Systems (+12194052457).

FS

Hey John, I'm getting ready to cross into Canada fishing. What is your ETA completion of moving out?

4/29/2024

SMS - Received on 4/29/2024 at 2:48 PM from Freezing Systems (+12194052457).

FS

The transformer wire became disconnected at some point last night up by you. I called Nipsco. They're going to come out to repair it. Please be advised they're going to try to get in there. Also, do not try to open your overhead door since we're missing part of the three phase it will burn up the motor.

MMS - Received on 4/29/2024 at 2:47 PM from Freezing Systems (+12194052457).

# EXHIBIT M

Rosario Scalise, LLC v. James Epstein — Complaint for Specific Performance (LaPorte Super. Ct. No. 3) with July 29, 2024 Purchase Agreement; buyer ready, Epstein refused

LaPorte Superior Court 3
Filed: 10/28/2024 3:28 PM
Clerk
LaPorte County, Indiana



STATE OF INDIANA ) IN THE LAPORTE SUPERIOR COURT NO. 3
) SS:
COUNTY OF LAPORTE )

ROSARIO SCALISE, LLC, )
an Indiana limited liability )
company, )
Plaintiff, )
)
vs. ) CAUSE NO. ~~46D03~~- 46D03-2410-PL-002838
)
JAMES EPSTEIN, )
Defendant. )

## COMPLAINT

## COUNT I
## SPECIFIC PERFORMANCE

Come now the Plaintiff, by counsel David Ambers, and for Count I of his Complaint against Defendant states that:

1. Plaintiff is a limited liability company organized in the State of Indiana and is over the age of eighteen (18).

2. Defendant is a resident of LaPorte County, Indiana and is over the age of eighteen (18).

3. On or about July 29, 2024, Plaintiff and Defendant James Epstein ("Defendant Epstein"), entered into a certain Purchase Agreement, a copy of which is attached hereto as Exhibit "A" and incorporated herein by this reference ("Purchase Agreement"), wherein Defendant Epstein agreed to sell and Plaintiff agreed to purchase certain real property located in LaPorte County, Indiana, which real property is described on the attached Exhibit "B" which is incorporated herein by this reference and commonly known as 3609 East Dunes Highway/210 Freyer Road, Michigan City, IN 46360 ("Real Estate").

4. Pursuant to the Purchase Agreement, the sale of the Real Estate to Plaintiff was to have closed on or before September 30, 2024, and possession of the Real Estate was to have been delivered to Plaintiff on the date of closing.

5. On September 30, 2024, Plaintiff was ready, willing and able to close the transaction, however, Defendant Epstein has refused to close pursuant to the terms of the Purchase Agreement.

6. Plaintiff performed all of the conditions required of him pursuant to the Purchase Agreement prior to September 30, 2024.

7. Defendant Epstein continues to offer the Real Estate for sale, despite repeated offers from Plaintiff to close the transaction pursuant to the Purchase Agreement.

8. Paragraph P(11) states: "Any party who is the prevailing party against any other party in any legal or equitable proceeding relating to this Agreement shall be entitled to recover court costs and reasonable attorney's fees from the non-prevailing party."

9. Plaintiff is entitled to recover his attorney fees and costs incurred prior to and after the date of the filing of this Complaint from Defendant.

10. This Court should order Defendant to convey the Real Estate to Plaintiff pursuant to the terms contained in the Purchase Agreement.

11. If Defendant fails to convey the Real Estate to Plaintiff, this Court should appoint a Commissioner to convey the Real Estate to Plaintiff on Defendant's behalf.

12. Defendant should pay to Plaintiff all costs and attorney fees incurred by Plaintiff in enforcing the Purchase Agreement.

13. Real estate, by its nature, is unique and cannot be replaced. Thus, beyond specific performance, Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays that his Court grant him a judgment of specific performance against Defendant, order Defendant to close the sale of the Real Estate to Plaintiff pursuant to the terms of the Purchase Agreement, to pay to Plaintiff the amount incurred by Plaintiff in attorney's fees and costs in enforcing the Purchase Agreement and for all other just and proper relief in the premises.

Respectfully Submitted,

David Ambers
Attorney for Plaintiff
601 State Street, Suite B
LaPorte, IN 46350
Atty. No. 14480-49
(219)325-9917

**COUNT II**
**BREACH OF CONTRACT**

Come now the Plaintiff, by counsel David Ambers, and for Count II of his Complaint against Defendant states that:

14. As rhetorical paragraphs 1-13 of Count II, Plaintiff hereby incorporates rhetorical paragraphs 1-13 of Count I.

15. All obligations to be performed by Plaintiff have been performed.

16. Defendant refuses to close the sale of the Real Estate pursuant to the Purchase Agreement despite demand by Plaintiff and thereby has breached the Purchase Agreement.

17. This Court should enter a judgment in favor of Plaintiff and against Defendant.

18. Plaintiff has suffered damages as a result of Defendant's breach of the Purchase Agreement.

WHEREFORE, Plaintiff prays that this Court grant him a judgment of specific performance against Defendant Epstein, to close the sale of the Real Estate to Plaintiff pursuant to the terms of the Purchase Agreement, to pay to Plaintiffs the amount incurred by Plaintiff in attorney's fees and costs in enforcing the Purchase Agreement, to compensate Plaintiff for the damages he has suffered and incurred, and for all other just and proper relief in the premises.

Respectfully Submitted,

David Ambers
Attorney for Plaintiff
601 State Street, Suite B
LaPorte, IN 46350
Atty. No. 14480-49
(219)325-9917

DigiSign Verified - 4b9a8583-170d-4f45-9193-67d7459f65bc



Listing Broker (Co.) Weichert Realtors, Merrion Group ( 641 ) By Marge E Skwiat-Gloy ( 12424 )
office code / individual code

Selling Broker (Co.) McColly Real Estate ( 233 ) By Mary Beth Meyers ( 12314 )
office code / individual code

# PURCHASE AGREEMENT

## COMMERCIAL-INDUSTRIAL REAL ESTATE

**For use only by members of the Indiana Association of REALTORS®**

A. **PARTIES:** James Epstein ("Seller") agrees to sell and convey to Rosario Scalise, LLC, an Indiana Limited Liability Company ("Buyer") and Buyer agrees to buy from Seller the following property for the consideration and subject to the following:

B. **PROPERTY:** The property is commonly known as 3609 E Dunes Highway/210 Freyer Rd., Michigan City, In 46360 in Michigan Township, La Porte County, Michigan City Indiana, 46360, including all buildings and permanent improvements and fixtures attached owned by Seller; all privileges, easements and appurtenances pertaining thereto including any right, title and interest of Seller in and to adjacent streets, alleys, rights-of-way, leases, rents, security deposits, licenses and permits with respect to the property, trade name, and warranties or guaranties relating to the property being sold, and any personal property specified herein; all of the above referred to as the "Property," the legal description of which is ☐ (attached as Exhibit "A") ☒ (described as follows): 42-01-14-477-001 IN SE 1/4 SE 1/4 S OF HWY S14 T38 R4, 1.322A. 42-01-14-477-002 IN SE 1/4 SE 1/4 S OF HWY S14 T38 R4 1A. ; subject to exact determination by survey pursuant to Paragraph J.

**The following items of personal property are INCLUDED in the sale:** ______

**All other personal property and the following additional items are EXCLUDED from the sale:** ______

Within ____ days from the Effective Date (defined below), Seller shall provide Buyer the items, if in its possession or control, described on Exhibit "B" attached hereto. Buyer agrees to keep all items provided by Seller, including, but not limited to those items described in Exhibit "B" strictly confidential except to the extent shared with Buyer's consultants and agents, who shall be bound to Buyer to keep same confidential. Notwithstanding anything to the contrary contained herein, Buyer acknowledges that any information, engineering data, feasibility or marketing reports, soils reports, or other information of any kind or nature relating to the Property contained in the reports which Buyer has received or may receive from Seller or its agents, is, will be, or has been furnished on the express condition that Buyer shall make its own independent verification of the accuracy of the information. Buyer agrees that Buyer shall not attempt to assert any liability against Seller by reason of Seller's having furnished such information or by reason of any such information becoming or proving to have been incorrect or inaccurate in any respect.

C. **PRICE:** The purchase price shall be Five Hundred Fifteen Thousand Dollars ($ 515,000.00 ) U.S. Dollars, payable ☐ (in cash at closing) ☒ (in accordance with the terms and conditions in this Agreement).

D. **EARNEST MONEY:** Buyer submits $ 10,000.00 U.S. Dollars as Earnest Money to be held by Listing office (Listing office has the earnest money deposit) as Escrow Agent within NA days following execution and receipt of this Agreement and any counteroffer by both parties (the "Effective Date"). **If Buyer fails for any reason to timely submit Earnest Money, Buyer agrees Seller may terminate this Agreement by serving a Notice of Termination to Buyer prior to Escrow Agent's receipt of the Earnest Money.** The Earnest Money shall be applied to the purchase price at closing unless returned to Buyer, released to Seller, or otherwise disbursed in accordance with this Agreement. The Escrow Agent is not a party to this Agreement and does not assume or have any liability for performance or non-performance of any party. Before the Escrow Agent has any obligation to disburse the Earnest Money in the event of dispute, Escrow Agent has the right to require from all parties a written release of liability of the Escrow Agent, termination of the Agreement and authorization or court order to disburse the Earnest Money. If the Escrow Agent is the Listing Broker ("Broker") described above, Broker shall be absolved from any responsibility to make payment to the Seller or Buyer unless the parties enter into a Mutual Release or a Court issues an Order for payment, except as permitted in 876 IAC 8-2-2 (release of earnest money). Upon notification that Buyer or Seller intends not to perform, Broker holding the earnest money may release the Earnest Money as provided in this Agreement. If no provision is made in this Agreement, Broker may send to Buyer and Seller notice of the disbursement by certified mail of the intended payee of the Earnest Money. If neither Buyer nor Seller enters into a mutual release or initiates litigation within sixty (60) days of the mailing date of the certified letter, Broker may release the Earnest Money to the party identified in the certified letter. Buyer and Seller agree to hold the Broker harmless from any liability, including attorney's fees and costs, for good faith disbursement of Earnest Money in accordance with this Agreement and licensing regulations.

E. **ADDITIONAL PROVISIONS: Included in this Agreement are the following addenda: (Place an "X" on the appropriate line or lines)**

- ___ Financing Addendum
- ___ Leased Property Addendum
- ___ Zoning/Governmental Approval Addendum
- _X_ Alternative Dispute Resolution Addendum
- ___ Addendum to Purchase Agreement
- ___ Feasibility Study Addendum
- ___ Exchange Addendum
- ___ Representations & Warranties of Seller Addendum
- _X_ Lead-Based Paint Disclosure Addendum
- ______ (office use only)





EXHIBIT
A

DigiSign Verified - 4b9a8583-170d-4f45-9193-67d7459f65bc


F. **CLOSING:** The closing of the sale shall take place at ☒ (the Title Company) ☐ (________________________________________) on or before September 30, 2024 or within ________ days after the end of both the Inspection Period and any of the periods described in any of the above referenced Addenda which are part of this Agreement, whichever is later, (the "Closing Date") or this Agreement shall terminate unless the Closing Date is changed in writing by Seller and Buyer, or otherwise extended pursuant to this Agreement.

G. **POSSESSION:** The possession of the Property shall be delivered to Buyer, subject to the rights of tenants in possession, if any, in its present condition, ordinary wear and tear excepted, on the Closing Date. Seller shall maintain the Property, including fixtures, equipment and any included personal property in its present condition except ordinary wear and tear, until possession is delivered to Buyer. Seller shall not enter into any leases, lease amendment, lease terminations or any service agreements for the Property without Buyer's consent.

H. **REAL ESTATE TAXES:** All taxes payable in any prior calendar year and remaining unpaid, shall be the obligation of Seller, and all taxes payable in the year of closing shall be prorated between Seller and Buyer on a calendar year basis as of the Closing Date. If the tax rate for taxes payable in the current year has not been determined at the closing of the transaction, said rate shall be assumed to be the same as the prior year for the purpose of such proration and a credit at closing shall be given to Buyer for due but unpaid taxes or any other taxes which are Seller's obligation, and no adjustment shall be made following closing. Any refunds for tax appeals after deducting any legal fees and costs shall be prorated between Buyer and Seller based upon who owned the Property during the time period for which such refunded taxes were assessed, and Seller shall have the right to direct any pending appeal and use counsel or companies of its choice to appeal the real estate taxes and assessments. **(NOTE: The succeeding year's tax bill for recently constructed buildings or following reassessment periods may greatly exceed the last tax bill available to the closing agent.)**

I. **INSURANCE AND RISK OF LOSS:** Seller shall maintain replacement cost (if available) or actual cash value "all risk" insurance on the Property through the Closing Date. Seller's insurance shall be canceled as of the Closing Date and Buyer shall provide its own insurance thereafter. Risk of loss by damage or destruction to the Property prior to the Closing Date shall be borne by Seller. Seller shall promptly provide Buyer with all insurance policies in its possession and if not in its possession, shall request the same from its insurance agent and correspondence received or sent by Seller or its agent or insurance company relating to the Property and the damage. Seller shall timely file a claim with its insurance company and shall not settle any claim with the insurance company without Buyer's written consent. In the event any damage or destruction is not anticipated to be fully repaired prior to closing, Buyer, at its option, within 15 days following the damage or destruction, may, by notice to Seller, either terminate this Agreement or elect to close the transaction, in which event Seller's right to all insurance proceeds not yet applied to repair of the damage or destruction shall be assigned in writing by Seller to Buyer at closing. Seller shall reimburse Buyer at closing for any insurance deductible.

J. **CONDITIONS TO CLOSING:** Buyer's obligations under this Agreement are conditioned upon satisfaction of each of the following items which are for the Buyer's benefit and may be waived by Buyer at Buyer's sole discretion within 14 days following the Effective Date (the "Inspection Period").

1. **Title Commitment:** A commitment for title insurance (the "Commitment") issued by a reputable title insurance company selected or approved by Buyer (the "Title Company") showing marketable title in Seller's name shall be ordered by ☒ (Seller) ☐ (Buyer) promptly following the Effective Date upon acceptance of this Agreement and shall be delivered to Buyer within 21 days following the Effective Date. At Buyer's request, legible copies of all recorded instruments affecting the Property or recited as exceptions in the Commitment shall also be delivered.
2. **Survey:** A survey shall be ordered by Buyer promptly following the Effective Date and shall be furnished at ☐ **(Seller's)** ☐ **(Buyer's)** expense within See further cond days after the Effective Date. It shall be prepared by a licensed Indiana surveyor selected by Buyer, shall comply with requirements for ALTA Surveys, shall reflect whether the Property is located in a designated flood zone area and shall be certified to Seller, Buyer, the Title Company and Buyer's lender.
3. **Title and Survey Approval:** If Buyer has an objection to items disclosed in the Commitment or the survey, Buyer shall make written objections to Seller within 14 days after receipt of both the Commitment and survey. Upon the expiration of such period, any item not objected to by Buyer or subsequently approved by Buyer in writing shall be deemed a permitted exception ("Permitted Exception"). If Buyer makes objections, Seller shall notify Buyer of its intent and have thirty (30) days from the date the objections are made ("Seller Cure Period") to cure those Seller is willing to cure, and the Closing Date shall be extended, if necessary. Seller shall not have any responsibility or duty to cure any objections. If the objections are not satisfied within the time period, Buyer may, within 5 days following the Seller Cure Period, either terminate this Agreement and receive a refund of the Earnest Money or waive the unsatisfied objections and close the transaction.
4. **Inspections: (Check paragraph (A) and/or (B) or paragraph (C) below)** Unless Buyer waives inspections under paragraph (C), Buyer shall have determined that the Property has no unacceptable, adverse environmental or physical condition as provided below.

☒ (A) **Environmental Assessment:** A Phase I environmental site assessment ("Phase I") on the Property shall be ordered by ☒ **(Seller)** ☐ **(Buyer)** promptly following the Effective Date at ☒ **(Seller's)** ☐ **(Buyer's)** expense from a reputable, qualified engineer, acceptable to Buyer and shall be received by Buyer within _____ days following the Effective Date (the "Environmental Report Date"). The Phase I shall be conducted in accordance with current ASTM standards unless otherwise agreed and may also include at Buyer's option the following matters:

(1) an investigation for the presence of asbestos, radon, lead or polychlorinated biphenyls (PCBs) on the Property; and/or

(2) an investigation to determine if the Property is located in any regulated or protected area under the jurisdiction of the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, the Indiana Department of Environmental Management, the Indiana Department of Natural Resources, the U.S. Fish and Wildlife Service or any other federal, state or local agency.

____________________ (office use only)


Copyright IAR 2024
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com commercial

DigiSign Verified - 4b9a8583-170d-4f45-9193-67d7459f65bc



If Buyer does not make a written objection to any problem(s) revealed in the report prior to the end of the Environmental Report Date, the environmental condition of the Property shall be deemed to be acceptable. If Buyer notifies Seller that the environmental condition is unsatisfactory prior to the end of the Environmental Report Date ("Buyer's Environmental Notice"), Seller shall notify Buyer of its intent to remediate such condition (the "Seller's Environmental Response") within __3__ days following receipt of Buyer's Environmental Notice and shall have a reasonable period of time, not to exceed __21__ days following Seller's Environmental Response to remediate the condition to Buyer's satisfaction and the Closing Date shall be extended, if necessary. If Seller fails or refuses to remediate, Buyer may upon notice to Seller within __3__ days of Seller's Environmental Response either terminate this Agreement and receive a refund of the Earnest Money or waive its objection and close the transaction.

☒ (B) **Physical Inspections:** Promptly upon acceptance of this Agreement, all physical inspections shall be ordered at ☐ **(Seller's)** ☒ **(Buyer's)** expense. Inspections shall be made by qualified inspectors or contractors, selected or approved by Buyer, with written reports delivered to Seller and Buyer. Inspections may include but are not limited to the following: heating, cooling, electrical, plumbing, roof, walls, ceilings, floors, foundation, basement, crawl space, mold, water, storm and waste sewer, well/septic, geotechnical, other: ____________________________. If Buyer, in its reasonable discretion, believes that an inspection report reveals a major defect in or with the Property, Buyer shall report such defect in writing to Seller within __12__ days of receipt of the report. If Buyer does not make a written objection to any problem(s) revealed in the report(s) within such time period, the Property shall be deemed acceptable to Buyer. Seller shall notify Buyer of any repairs it intends on making and shall have a reasonable period of time, not to exceed __30__ days following receipt of any objections by Buyer prior to such time period, to repair any such major defect to Buyer's reasonable satisfaction and the Closing Date shall be extended, if necessary. Seller shall have no responsibility or duty to make any repairs. If Seller fails or refuses to repair, Buyer, within __3__ days following Seller's notice of any repairs it intends on making, may either terminate this Agreement and receive a refund of the Earnest Money or waive its objection and close the transaction.

☐ (C) **Waiver of Inspections:** BUYER HAS BEEN MADE AWARE THAT INDEPENDENT INSPECTION DISCLOSING THE CONDITION OF THE PROPERTY ARE AVAILABLE, AND BUYER HAS BEEN AFFORDED THE OPPORTUNITY TO REQUIRE SUCH INSPECTIONS AS A CONDITION OF THIS AGREEMENT. HOWEVER, BUYER WAIVES THE RIGHT TO OBTAIN INSPECTIONS AND RELIES UPON THE CONDTION OF THE PROPERTY BASED UPON BUYER'S OWN EXAMINATION AND RELEASES SELLER AND LISTING AND SELLING BROKER(S) FROM ANY AND ALL LIABILITY RELATING TO ANY PROBLEM, DEFECT OR DEFICIENCY AFFECTING THE PROPERTY, WHICH RELEASE SHALL SURVIVE THE CLOSING.

☐ (D) Buyer on behalf of itself and its successors and assigns acknowledges it is acquiring the Property "AS-IS" and has determined to purchase the Property fully understanding (i) the physical condition of the Property including, without limitation, all seismic elements, the environmental condition of the Property and hazardous materials on, under or about the Property (collectively the "Condition"), and (ii) any law or regulation applicable to the Property, including, without limitation, the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended (42 U.S.C Section 9601, et. seq.), the Clean Water Act (33 U.S.C Section 1251, et seq.), the Safe Drinking Water Act (42 U.S.C. Section 300f, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Section 1801, et seq.) and the Toxic Substances Control Act (15 U.S.C Section 2601, et seq.) and any other federal, state or local laws relating to the environment, natural resources, or public health and safety (collectively the "Laws"). Buyer on behalf of itself and its successors and assigns waives its right to recover from, and forever releases and discharges, Seller, Seller's affiliates, Seller's investment manager, management company, broker, and the partners, trustees, beneficiaries, shareholders, members, managers, directors, officers, employees and agents of each of them, and their respective heirs, successors, personal representatives and assigns, from and against any and all demands, claims, legal or administrative proceedings, losses, liabilities, damages, penalties, fines, liens, judgments, costs or expenses whatsoever (including without limitation, attorneys' fees and costs), whether direct or indirect, known or unknown, foreseen or unforeseen, arising out of, relating to or resulting from the Condition or the Laws. BUYER ACKNOWLEDGES AND AGREES THAT IT HAS BEEN REPRESENTED BY LEGAL COUNSEL OF ITS CHOICE IN CONNECTION WITH THIS AGREEMENT AND THAT SUCH COUNSEL HAS EXPLAINED TO BUYER THE PROVISIONS OF THIS SECTION 4(D).

Buyer and its agents shall have the right to enter upon the Property upon reasonable advance notice and make all inspections provided for herein. Buyer shall restore any damage to the Property resulting from the entry of Buyer or its agents to Seller's satisfaction and shall indemnify, defend and hold harmless Seller as to any injury to persons or damage to their property resulting from the negligence of Buyer or its agents in conducting their activities on the Property. Prior to accessing the Property, Buyer shall provide Seller with evidence of commercial general liability insurance of not less than $1,000,000.00 and naming Seller as an additional insured. These obligations shall survive termination of this Agreement or Closing.

K. **PRORATIONS AND SPECIAL ASSESSMENTS:** Interest on any debt assumed or taken subject to, any rents, all other income and ordinary operating expenses of the Property, including but not limited to, public utility charges, shall be prorated as of the day prior to the Closing Date. Any special assessments applicable to the Property for municipal improvements made to benefit the Property prior to the date of acceptance of this Agreement shall be paid by Seller at or before closing. At closing, Buyer will assume and agree to pay all special assessments for municipal improvements which are completed after acceptance of this Agreement.

L. **SALES EXPENSES:** All sales expenses are to be paid in cash prior to or at the closing as follows in addition to the other items described in this Agreement.

(Check the applicable party who pays)

| ITEM | Seller | Buyer |
|---|---|---|
| 1. Release of existing loans and recording releases | X | |
| 2. Closing Fee | X | X |
| 3. Preparation of Deed and Vendor's Affidavit | X | |

__________________ • ________ (office use only)



Copyright IAR 2024

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com commercial dunes

| ITEM | (Check the applicable party who pays) Seller | Buyer |
|---|---|---|
| 4. New or assumed loan fees | | X |
| 5. Title search fee | X | |
| 6. Title Policy Premium-Owner | X | |
| 7. Title Policy Premium-Lender | | X |
| 8. Other Title Company Costs | X | |

M. **DEFAULT:** If Buyer breaches this Agreement, Seller may seek any remedy provided by law or equity, or terminate this Agreement and receive the Earnest Money as liquidated damages. If Seller breaches this Agreement, Buyer may terminate this Agreement and receive a refund of the Earnest Money, or Buyer may seek specific performance as its sole remedy at law or in equity. In the event of Seller default, Seller shall immediately be obligated to pay all brokerage commissions that would have been paid had this transaction closed. In the event of Buyer default, commissions may also be due and payable pursuant to the terms of the applicable brokerage agreements.

N. **DUTIES OF BUYER AND SELLER AT CLOSING:**

1. **At the closing, Seller shall deliver or cause to be delivered to Buyer, at Seller's sole cost and expense, except as otherwise provided in this Agreement, the following:**

(A A duly executed and acknowledged Special Warranty Deed conveying marketable title in fee simple to all of the Property, free and clear of any and all liens, encumbrances, conditions, easements, assessments, reservations and restrictions, except Permitted Exception(s);

(B) A pro-forma Owner's Policy of Title Insurance or marked up title commitment (the "Title Policy") issued by the Title Company in the amount of the purchase price, dated as of closing, insuring Buyer's fee simple title to the Property to be marketable subject only to the Permitted Exception(s), and deleting the standard printed exceptions contained in the usual form of the Title Policy;

(C) An executed Vendor's Affidavit in form acceptable to the Title Company;

(D) A Bill of Sale, duly executed by Seller, containing warranties of title, conveying title, free and clear of all liens, to any personal property specified in Paragraph B;

(E) An assignment (the "Assignment"), duly executed by Seller, of leases, prepaid rents, security deposits, and trade name, and to the extent assignable, licenses and permits, warranties or guarantees, and to the extent agreed to be assumed by Buyer, all service, maintenance, management or other contracts relating to the ownership or operation of the Property. Such assignment shall include an indemnity from Seller in favor of Buyer with respect to all claims and obligations arising under such leases and contracts prior to the Closing Date. If Buyer does not agree to assume any such contract, then Seller shall deliver evidence of termination of such contract at closing and shall indemnify Buyer as to all claims and obligations thereunder;

(F) A current rent roll duly certified by Seller and any security or tenant deposits, if applicable;

(G) Evidence of its capacity and authority for the closing of this transaction;

(H) Certification establishing that no federal income tax is required to be withheld under the Foreign Investment and Real Property Tax Act, or consent to withhold tax from the proceeds of sale as required, unless it is established that the transaction is exempt;

(I) A Sales Disclosure Form as required by law ("SDF").

(J) All other executed documents necessary to close this transaction.

2. **At the closing, Buyer shall perform, at Buyer's sole cost and expense, except as otherwise provided in this Agreement, the following:**

(A) Pay the cash portion of the purchase price in the form of a cashier's check (if the Purchase Price is under $10,000) or other immediately available funds. If purchase price is $10,000 or more, the funds shall be wired unconditionally to closing agent's escrow account;

(B) Execute any note(s) and mortgage(s) and cause the funds to be made available to the closing agent for disbursement;

(C) Provide evidence of its capacity and authority for the closing of this transaction;

(D) Provide to Buyer's lender any title policy as required by the holder(s) of the mortgage(s);

(E) The Assignment. Such assumption agreement shall include an indemnity from Buyer in favor of Seller as to claims and obligations arising under such leases and contracts assumed by Buyer from and after the Closing Date;

(F) The SDF.

(G) Execute all other documents necessary to close this transaction.

O. **CONDEMNATION:** Seller shall promptly notify Buyer in writing of the commencement of any condemnation proceedings against any portion of the Property. If such condemnation proceedings are commenced, Buyer, at its option, may (1) terminate this Agreement by written notice to Seller within seven (7) days after Buyer is advised of the commencement of condemnation proceedings, or (2) appear and defend in any condemnation proceedings, and any award shall, at Buyer's election, (a) become the property of Seller and reduce the purchase price by the same amount or (b) shall become the property of Buyer and the purchase price shall not be reduced.

P. **MISCELLANEOUS:**

1. Any notice required or permitted to be delivered shall be deemed received when personally delivered or when confirmed as received by facsimile (with a copy sent by United States mail), express courier or United States mail (postage prepaid, certified and return receipt requested) addressed to Seller or Buyer or their designee at the address set forth below the signature of each party. If no address is listed, then the address of the registered agent filed with the applicable Secretary of State for entities and the address of his/her broker for any individual.
2. This Agreement shall be construed in accordance with the laws of the State of Indiana.
3. Time is of the essence. Time periods specified in this Agreement and any addenda are calendar days and shall expire at 11:59 p.m. of the date stated unless the parties agree otherwise in writing.
4. This Agreement is binding upon and for the benefit of the parties' respective heirs, administrators, executors, legal representatives, successors, and assigns. Buyer may not assign this Agreement without the consent of Seller. No assignment of this Agreement shall release a party from liability for its obligations hereunder.

_______________________ (office use only)


Copyright IAR 2024
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com commercial dunes

DigiSign Verified - 4b9a8583-170d-4f45-9193-67d7459f65bc


5. If any provision contained in this Agreement is held invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability shall not affect any other provision.
6. This Agreement constitutes the entire agreement of the parties and cannot be changed except by their written consent.
7. By signing below, the parties to this transaction acknowledge receipt of a copy of this Agreement and give their permission to a Multiple Listing Service or other advertising media, if any, to publish information regarding this transaction.
8. Broker(s) may refer Buyer or Seller to other professionals, service providers or product vendors, including lenders, loan brokers, title insurers, escrow companies, inspectors, surveyors, engineers, consultants, environmental inspectors and contractors. Broker(s) has no responsibility for the performance of any service provider and/or inspector. Buyer and Seller are free to select providers/inspectors other than those referred or recommended to them by Broker(s).
9. Buyer discloses to Seller that Buyer is licensed and holds License # ______________. Seller discloses to Buyer that Seller is licensed and holds License # ______________.
10. Where the word "Broker" appears, it shall mean "Licensee" as provided in I.C. 25-34.1-10-6.8.
11. Any party who is the prevailing party against any other party in any legal or equitable proceeding relating to this Agreement shall be entitled to recover court costs and reasonable attorney fees from the non-prevailing party.
12. The parties agree that this Agreement may be transmitted between them electronically or digitally. The parties intend that electronically or digitally transmitted signatures constitute original signatures and are binding on the parties. The original document shall be promptly executed and/or delivered. This Agreement may be executed simultaneously or in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.
13. Each person executing this Agreement on behalf of a party represents and warrants that he or she has been authorized by all necessary action to execute and deliver this Agreement on behalf of such party.

Q. **SECTION 1031 EXCHANGE:** Buyer and Seller acknowledge that either might wish to complete the transaction contemplated hereby as part of a tax deferred exchange pursuant to Section 1031 of the Internal Revenue Code. Buyer and Seller each shall cooperate with the other's 1031 exchange and execute any documents reasonably required in connection therewith, provided no liability, delay or cost is associated therewith or results therefrom. In the case of any such 1031 exchange this Agreement may be assigned to the qualified intermediary in such transaction.

R. **FURTHER CONDITIONS (List any additional provisions):**
**Closing is subject to the Tenant - John Bricker - moving out and space broom cleaned prior to the closing date. The closing is also subject to the buyer conducting a thorough final walk through and deeming the property to be in satisfactory condition.**
**The closing date is not yet determined due to the ongoing eviction process of the tenant - John Bricker.**
**This offer is subject to the buyer verifying the receipt of the survey and envionmental report that were completed earlier this year.**

S. **CONSULT YOUR ADVISORS:** Buyer and Seller acknowledge they have been advised that, prior to signing this document, they should seek the advice of an attorney for the legal or tax consequences of this document and the transaction to which it relates. In any real estate transaction, it is recommended that you consult with a professional, such as a civil engineer, environmental engineer, or other person, with experience in evaluating the condition of the property, including the possible presence of asbestos, hazardous and/or toxic materials and underground storage tanks.

T. **CONFIRMATION OF AGENCY RELATIONSHIPS:** Buyer and Seller acknowledge that each has received agency office policy disclosures, had agency explained and now confirm their agency relationships. Buyer and Seller further acknowledge that they understand and accept agency relationships involved in this transaction.

U. **TERMINATION OF OFFER:** Unless accepted by Seller and delivered to Buyer by 12:00 ☐ (A.M.) ☒ (P.M.) ☒ (Noon), the 31st day of July, 2024, this Purchase Agreement shall be null and void and all parties shall be released of any and all liability or obligations.

07/25/2024, 04:27:25 PM CDT

| | |
|---|---|
| Rosario Scalise, LLC an Indiana Limited Liability Company | |
| BUYER'S SIGNATURE DATE | BUYER'S SIGNATURE DATE |
| Rosario Scalise, LLC, An Indiana Limited Liablity Company | |
| PRINTED | PRINTED |
| (312)617-3773 | |
| (AREA CODE) TELEPHONE NUMBER/FAX NUMBER | (AREA CODE) TELEPHONE NUMBER/FAX NUMBER |
| 2819 S Lowe, Chicago, IL 60616 | |
| BUYER'S ADDRESS FOR NOTICE PURPOSES | |

(office use only)


Copyright IAR 2024
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com commercial duties

DigiSign Verified - 4b9a8583-170d-4f45-9193-67d7459f65bc


## ACCEPTANCE OF PURCHASE AGREEMENT

**SELLER'S RESPONSE: (Check appropriate paragraph number):**

On 07/29/24, at 6:29 PM ☐ A.M. ☒ P.M. ☐ Noon

☒ **1. The above offer is Accepted.**

☐ **2. The above offer is Rejected.**

☐ **3. The above offer is Countered. See Counter Offer. Seller should sign both the Purchase Agreement and the Counter Offer.**

6:29 PM 07/29/24

SELLER'S SIGNATURE DATE SELLER'S SIGNATURE DATE

James M Epstein

PRINTED PRINTED

(AREA CODE) TELEPHONE NUMBER/FAX NUMBER (AREA CODE) TELEPHONE NUMBER/FAX NUMBER

SELLER'S ADDRESS FOR NOTICE PURPOSES

Prepared and provided as a member service by the Indiana Association of REALTORS®, Inc. (IAR). This form is restricted to use by members of IAR. This is a legally binding contract, if not understood seek legal advice.
Form #F05. Copyright IAR 2024

(office use only)



Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com commercial duane

SCHEDULE A
(continued)

5. The Land is described as follows:

For APN/Parcel ID(s): 46-01-14-477-002.000-022 and 46-01-14-477-001.000-022

Parcel 1: Part of the Southeast 1/4 of the Southeast 1/4 of Section 14, Township 38 North, Range 4 West of the 2nd Principal Meridian, LaPorte County, Indiana, lying within the Original Plat of White Oak Park Subdivision in the Town of Lakeland; being more particularly described as follows: Commencing at the Southeast corner of said Section 14; thence North 89 degrees 51 minutes West along the South line of said Section 14, a distance of 1150.94 feet; thence North 0 degrees 09 minutes East, a distance of 20.00 feet to the place of beginning; thence continue North 0 degrees 09 minutes East, a distance of 225.38 feet; thence North 29 degrees 59 minutes West, a distance of 168.52 feet to a point on the Southerly right of way line of U.S. Highway No. 12; thence North 51 degrees 49 minutes East along said right of way line, a distance of 9.96 feet; thence North 60 degrees 01 minutes East along said right of way line, a distance of 102.14 feet; thence South 29 degrees 59 minutes East, a distance of 170.00 feet; thence South 0 degrees 09 minutes West, a distance of 281.60 feet; thence North 89 degrees 51 minutes West, a distance of 96.86 feet to the place of beginning.

Parcel 2: Part of the Southeast 1/4 of the Southeast 1/4 of Section 14, Township 38 North, Range 4 West of the 2nd Principal Meridian, LaPorte County, Indiana, being more particularly described as follows: Commencing at the Southeast corner of said Section 14; thence North 89 degrees 51 minutes West along the South line of said Section 14, a distance of 1150.94 feet; thence North 0 degrees 9 minutes East, a distance of 20.00 feet to the place of beginning; thence North 89 degrees 51 minutes West, a distance of 177.43 feet; thence North 1 degrees 29 minutes West, a distance of 296.82 feet, to the Southerly right of way line of U.S. Highway No. 12; thence North 60 degrees 01 minutes East along said right of way line, a distance of 31.37 feet; thence North 51 degrees 49 minutes East along said right of way line, a distance of 94.63 feet; thence South 29 degrees 59 minutes East, a distance of 168.52 feet; thence South 0 degrees 09 minutes West, a distance of 225.38 feet to the place of beginning.

END OF SCHEDULE A

*This page is only a part of a 2021 ALTA® Commitment for Title Insurance issued by Fidelity National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

AMERICAN LAND TITLE ASSOCIATION



EXHIBIT
tabbles
B

# EXHIBIT N

Franchise Disclosure Document of Weichert Real Estate Affiliates, Inc. (Mar. 14, 2025)
— Item 11 inspection/audit and Item 15 Responsible Broker requirements

| Obligation | Section in Agreement | Item in Disclosure Document |
|---|---|---|
| m. Maintenance, appearance and remodeling requirements | Sections 7.12 of Franchise Agreement | Item 11 |
| n. Insurance | Article 8 of Franchise Agreement | Item 6 |
| o. Advertising | Article 9 of Franchise Agreement | Item 11 |
| p. Indemnification | Sections 7.17 and 14.04 (C) of Franchise Agreement | Item 6 |
| q. Owner's participation/ management/staffing | Sections 7.06 and 7.07 of Franchise Agreement | Item 15 |
| r. Records and reports | Article 10 and Section 4.07 of Franchise Agreement | Item 6 |
| s. Inspections and audits | Sections 7.18, 10.02 and 18.02(B)(3) of Franchise Agreement; Article 6 of Weichert Works Software License Agreement; Article 7 of the MyWeichert Software License Agreement | Item 6 |
| t. Transfer | Article 14 of Franchise Agreement Article 7 of Weichert Works Software License Agreement; Article 8 of the MyWeichert Software License Agreement | Item 17 |
| u. Renewal | Article 13 of Franchise Agreement | Item 17 |
| v. Post-termination obligations | Article 18 of Franchise Agreement; Article 9 of Weichert Works Software License Agreement; Article 10 of MyWeichert Software License Agreement | Item 17 |
| w. Non-competition covenants | Article 12 of Franchise Agreement | Item 17 |
| x. Dispute resolution | Articles 20-25 and 28, Sections 12.05 and 18.01 (D) of Franchise Agreement; Articles 8, 11, 12, 13, 14, 16 and 17 of Weichert Works Software License Agreement; Articles 9, 12, 13, 14, 15, 19, 20 and 21 of MyWeichert Software License Agreement | Item 17 |
| y. Other (personal guaranty) | Article 29 and Exhibit D of the Franchise Agreement | Item 15 |

## ITEM 10 FINANCING

We do not offer direct or indirect financing. We do not guarantee your note, lease or other obligations.

## ITEM 11 FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.**

**Pre-Opening Obligations**

Before you open your Office, we will:

(1) Designate your Territory. (Franchise Agreement, Section 2.01 and Exhibit A to the Franchise Agreement)

(2) Provide you with a Franchisee "Conversion Package" of goods and services, the cost of which will be included in the Initial Franchise Fee. The current Conversion Package includes tuition, economy travel and lodging for one person to attend the Weichert Leadership Academy, press releases, three (3) listing presentation portfolios, and the ability to place your listings on our Weichert.com site. We may add or subtract products or services from the Conversion Package at any time in our sole judgment. The specific contents of the Conversion Package that we will provide to you will be listed on Exhibit A to your Franchise Agreement. (Franchise Agreement, Section 6.04). We may suspend or rescind all or any part of your Conversion Package if you do not pay us (or our Affiliates) money that you owe us (or our Affiliates) on time or if you have received a Notice of Default under this Agreement, even if the default was timely cured.

(3) Lend you a copy of our Confidential Operations Manual (the "Manual"). You must strictly comply with the Manual in operating your Weichert Business. We can change the Manual, and you must comply with these changes when you receive them, but they will not materially alter your rights and obligations under the Franchise Agreement.

Under certain circumstances, we may decide to lend you a copy of the Manual before you sign the Franchise Agreement. If we do lend you a copy of the Manual, you must sign a Receipt (in Exhibit A to this disclosure document). By signing the Receipt, you acknowledge that we own all proprietary rights in the Confidential Operations Manual, and that you are acquiring no proprietary or other rights to them. You must treat the Confidential Operations Manual and the information contained in it as confidential. If you or we decide not to enter into a Franchise Agreement, then you must immediately return the Confidential Operations Manual to us and you may not use the information contained in the Confidential Operations Manual for any purpose.

The following is the Table of Contents of the Manual as of the date of this disclosure document:

| TOPIC | NUMBER OF PAGES |
|---|---|
| **Policies & Procedures:** Understanding your franchise, your legal obligations, operating your real estate office, business reporting, guidelines for advertising, sample by-laws of local broker councils, referrals and relocation | 55 |
| **The Logo Book:** The proprietary marks, signage, stationery, name badges, advertising | 73 |
| **Training:** Weichert® training, core courses, advanced courses, specialty courses and other educational events, training policies & procedures | 8 |

All owners of a proprietorship interest in you, at the same time as the signing of the Franchise Agreement (or at the later time they assume this status).

All of the persons enumerated in the covenants not to compete set forth in the Franchise Agreement as intended to be embraced by them.

***Your Developments.*** You must irrevocably license to us any real-estate related services, programs, products, equipment, and intellectual property you develop and all sales, marketing, advertising and promotional programs and campaigns you develop. We will not be liable to you in any way because of this license.

***Our Right to Use Information We Obtain from You.*** We can use all information concerning your clients that you report to us or which we learn due to your status as a Weichert franchisee (the "Client Information"). During the term of the Franchise Agreement, we can use the Client Information for business purposes, including (for example), public relations, advertising and direct mail solicitations; statistical compilations; investigations and resolutions of complaints; inclusion on our Web site; and, inspections, operational audits, financial audits and quality surveys. If the Franchise Agreement expires or terminates, we can continue to use the Client Information as described above, and we can also make the Client Information available to our affiliates and franchisees for whatever purposes we consider appropriate.

## ITEM 15 OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

***Your Participation Requirements.*** You must personally supervise the operation of the Franchised Business, unless we permit in writing. You must devote the necessary time and your best efforts for the proper and effective operation of the Business.

***Responsible Broker.*** When you sign the Franchise Agreement, you or a person you designate must be a real estate broker duly licensed under all applicable laws, rules and regulations of the Territory (your "Responsible Broker"). The name of your initial Responsible Broker will be on Exhibit A to your Franchise Agreement. Your Responsible Broker must personally and directly supervise the operation of the Franchised Business; and, unless we permit otherwise, must also be your Business Manager (see below). You must immediately notify us of the death, disability or termination of employment of your Responsible Broker or the loss or suspension of your Responsible Broker's real estate brokerage license. You must designate a successor or acting Responsible Broker no later than 10 days following the death, disability, termination of a Responsible Broker or the loss or suspension of your Responsible Broker's real estate brokerage license. Each successor or acting Responsible Broker must be a licensed real estate broker under applicable law in the Territory, must receive our approval and must possess any required credentials in our Operations Manual. You must provide us with written notice of any changes to your designated Responsible Broker.

***Business Manager.*** If an individual, you must either serve as or designate a Business Manager. An entity franchisee must designate a Business Manager. Unless we permit otherwise, your Business Manager must be your Responsible Broker (see above). You must inform us in writing as to the identity of your Business Manager and any successor Business Managers. Each Business Manager must receive our advance written approval. You agree immediately to notify us of the death, disability or termination of employment of your Business Manager. You must designate a successor or acting Business Manager no later than 10 days following the death, disability or termination of the predecessor Business Manager.

***Office Managers.*** You must designate an Office Manager for each Office. Your Business Manager may serve as the Office Manager for one of your Offices. If you have only one Office, your Office

Manager, Business Manager and Responsible Broker may be the same person. You must inform us in writing as to the identity of your Office Manager(s) and any successor Office Manager(s). You must immediately to notify us of the death, disability or termination of employment of any of your Office Managers. You must designate a successor or acting Office Manager no later than 10 days following the death, disability or termination of an Office Manager.

We strongly recommend that your Office Managers attend the Weichert Leadership Academy and participate in other local or regional management training that we provide, but we do not require this. We recommend, but do not require, that you send your Office Managers to our annual business conferences or conventions.

***Employment Agreements.*** You must enter into a written agreement with each Responsible Broker, Business Manager and Office Manager (unless you are an individual franchisee serving in this capacity), setting forth the terms and conditions of his or her employment with you. Your attorney should prepare and/or review this employment agreement to ensure its consistency with local or state law and your Franchise Agreement. The Employment Agreement signed by each Responsible Broker, Business Manager and Office Manager must include our "Confidentiality and Non-Competition Agreement" (Exhibit C to the Franchise Agreement). You alone have the ability to hire, control, discipline and terminate your employees and we have no such authority or ability. You agree that your employees are exclusively employed by you and that in no fashion is any such employee either employed, jointly employed or co-employed by us.

***No Required Equity Interest.*** If the franchisee is a business entity, the Responsible Broker, Business Manager and Office Managers need not have any equity interest in the franchisee entity.

***Guarantee and Confidentiality/Non-Competition Agreement.*** If the "franchisee" is a business entity, then when you sign the Franchise Agreement, the persons and/or entities we list on Exhibit A to your Franchise Agreement must sign our Guarantee (Exhibit D to the Franchise Agreement). The persons listed in Item 14 must sign our confidentiality/non-competition agreement (Exhibit C to the Franchise Agreement) and must keep our confidential and proprietary information confidential.

## ITEM 16 RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

***General.*** Except as otherwise described below, you must offer, sell and furnish all current and future Services, Ancillary Services and Products, and all programs and products which are part of the Weichert System and which we designate as mandatory in the Franchise Agreement or in our Operations Manual. You may not use the Weichert name or the Proprietary Marks for the benefit of any business other than the Franchised Business. You are prohibited from offering or selling any service, program or product which is not a part of the Weichert System or which we delete from the System without our advance written approval.

You may not conduct (or permit anyone else to conduct) any business other than the business contemplated by the Franchise Agreement at or from any of your Offices without first obtaining our written consent. If we permit you to furnish, offer or sell any service, program or product which is not a part of the Weichert System at or from any of your Offices, then we can set conditions for this approval including, for example, requirements that you inform the public in the way we require that the services, programs or products are not associated with the Proprietary Marks and are not endorsed or offered by us, our affiliates or our franchisees.

We may add to, delete from or modify the services, products and programs which you can and must offer, alter the System or abandon the System altogether in favor of another system. You must abide by any additions, deletions and modifications, but only if the changes do not materially and